# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GTX CORP., | ) |
|     PLAINTIFF, | ) CASE NO. |
| | ) |
|     v. | ) ORIGINAL COMPLAINT |
| | ) FOR PATENT INFRINGEMENT |
| SOCCER MANAGER LIMITED, | ) |
| | ) DEMAND FOR JURY TRIAL |
|     DEFENDANT. | ) |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff GTX Corp ("GTX"), by and through its attorneys, brings this Complaint for Patent Infringement against Defendant Soccer Manager Limited ("Soccer Manager"), and alleges as follows:

## NATURE OF THIS ACTION

1. This is a patent infringement action brought by GTX against Soccer Manager based on Soccer Manager's ongoing willful infringement of U.S. Patent No. 7,177,838 (the "Patent-In-Suit") arising under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., and seeking damages and injunctive relief under 35 U.S.C. §§ 271, 281, 283-285.

## PARTIES

2. Plaintiff GTX is a corporation organized under the laws of the State of Delaware, and has a principal place of business at 13430 N. Scottsdale Rd., Suite #300, Scottsdale, Arizona 85254.

3. Upon information and belief, Defendant Soccer Manager is a Limited Company organized under the laws of the United Kingdom, with a principal place of business at Shorrock

1

House, 1 Faraday Court, Preston, United Kingdom PR2 9NB.  Soccer Manager may be served through The Hague Convention.

## JURISDICTION AND VENUE

4. This is an action for patent infringement arising under the United States patent statutes, 35 U.S.C. § 1 et. seq.

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

6. On information and belief, this Court has personal jurisdiction over Defendant Soccer Manager because it serves and intends to continue to serve the United States market via its games and server(s), including customers in Delaware.

7. Venue is proper in this District under 28 U.S.C. § 1391(c)(3) or § 1400(b).

## FACTUAL BACKGROUND

### GTX

8. GTX is a corporation founded by Dr. Marvin T. Ling over thirty years ago. Dr. Ling is the named inventor on numerous patents, including the Patent-in-Suit.  GTX also produces patented Computer Aided Design (CAD) software, tools and other solutions which have been successful in the marketplace.

9. Many of GTX patents, including the Patent-in-Suit, have also been successfully license several companies from small businesses to Fortune 100 companies.

### Soccer Manager

10. Upon information and belief, Soccer Manager is an online game developer and publisher that enables consumers to acquire virtual currency and digital products (via the use of virtual currency) as part of Soccer Manager' games supported by its server(s).

11.     On February 9, 2018, GTX attempted to notify Soccer Manager of its infringement of the Patent-In-Suit by way of a letter sent via Federal Express and electronic mail to Soccer Manager's CEO, Andrew Richard Gore, identifying the Patent-In-Suit and providing notice that Soccer Manager infringed the same.

12.     Enclosed with the February 9, 2018, letter was a copy of the Patent-in-Suit along with a draft Complaint, which explained Soccer Manager's infringement of an exemplary claim, on an element-by-element basis.

13.     On information and belief, Soccer Manager received GTX's February 9, 2018 letter and accompanying draft Complaint on February 13, 2018.

14.     Despite GTX's attempt to seek a resolution with Soccer Manager, Soccer Manager has continued its ongoing willful infringement of the Patent-In-Suit.  As such, GTX has brought this action to seek just compensation for Soccer Manager's past and ongoing indirect infringement of the Patents-in-Suit.

## PATENT-IN-SUIT

15.     U.S. Patent No. 7,177,838 ("the '838 Patent"), entitled "Method and Apparatus for Conducting Electronic Commerce Transactions Using Electronic Tokens", was duly and legally issued to Marvin T. Ling by the United States Patent and Trademark Office ("USPTO") on February 13, 2007.  A true and correct copy of U.S. Patent No. 7,177,838 is attached as Exhibit A.  GTX is the lawful owner by assignment of the '838 Patent and holds all rights, title and interest in that patent.

## COUNT I

**(INFRINGEMENT OF U.S. PATENT NO. 7,177,838)**

16.     GTX repeats and realleges the allegations contained in Paragraphs 1 through 15 above as fully set forth herein.

**Direct Infringement By Soccer Manager's Customers**

17. Soccer Manager has indirectly infringed and continues to indirectly infringe, literally or under the doctrine of equivalents, one or more claims of the '838 Patent in violation of 35 U.S.C. § 271(b) in the United States. Soccer Manager's indirect infringement includes having induced and continuing to induce its customers to use the "server" of at least independent claim 27 of the '838 Patent.

18. Soccer Manager's infringement includes, without limitation, operating and/or marketing in the United States, the computer-based Soccer Manager server(s) that enables consumers to purchase virtual currency and digital products (with the virtual currency) via Soccer Manager's platform, and encouraging consumers to use the same to facilitate the purchase of virtual currency and digital products.

19. By way of example, claim 27 of the '838 Patent recites as follows:

- A server operated by a vendor that provides products for sale or rental over the Internet, the server comprising:
- a network interface through which the server communicates with a user over the Internet;
- a database;
- a memory;
- a processor that executes software stored in the memory, the software including one or more programmed routines, the programmed routines comprising:;
- a registration routine that opens a user account with a vendor in the database for the user;
- an electronic token sale routine that issues one or more electronic tokens from the vendor to the user account, wherein no physical manifestation,

- other than a database entry, of the user account occurs, each electronic token having a value of at least a fraction of a dollar;
- a display routine that displays the prices of the products in units of electronic tokens;
- a selection routine that permits the user to select, at any participating vendor web site, a subset of the products for purchase from the vendor without requiring the user to disclose personal information to the vendor, a total price of the subset of the products being computed in units of electronic tokens;
- authorizing a purchase transaction at the participating vendor web site without requiring any third party authentication and physical manifestation of the user account; a purchase routine that determines if the user account contains electronic tokens having a value equal to or greater than the total price, and if so, subtracts the total price from the user account, wherein the purchase transaction is not subject to a minimum processing fee; and
- a download routine that enables the use to download the selected subset from the Internet.

20. As noted in the "Background of the Invention" section of the '838 Patent, there were problems with Internet based ecommerce systems in that they frequently required purchasers to provide sensitive personal information to facilitate transactions. *See* Expert Declaration of John Rizzo Regarding U.S. Patent No. 7,177,838 (*i.e.*, "the Rizzo '838 Declaration") at Para. 9. A true and correct copy of the Expert Declaration of John Rizzo Regarding U.S. Patent No. 7,177,838 is attached as Exhibit B. To address this concern for potential fraud, the '838 Patent indicates that it would be desirable "to provide their purchasers the convenience of minimizing the requirement for interaction between a client computer and the

ASP server in order to complete the purchasing or rental transaction, as the case may be. It would also be desirable for ASPs to minimize or limit the frequency of asking the purchaser to transmit the user's private, sensitive information, such as credit card information. Although the purchaser's credit card number is encrypted during the transmission, it will be highly desirable to minimize its exposure through the Web." *See* Rizzo '838 Declaration at Para. 9; *see also* '838 Patent at 2:11-23.

21. In addition, the '838 Patent indicates that "'micropayment' transactions, sometimes amounting to only fractions of a cent, may also occur in the context of providing access to media, or Web-based services, such as search engines. In each of these cases, it is necessary to provide a way for users to pay for such transactions without incurring the overhead of a credit card charge." *See* Rizzo '838 Declaration at Para. 10; *see* '838 Patent at 2:27-33. To this end, the '838 Patent indicates that it is "an object of the present invention to provide electronic currency or tokens that may be issued and used with minimal overhead, and that do not require on-line communications with a bank or other organization to issue or use the tokens." *See* Rizzo '838 Declaration at Para. 10; *see* '838 Patent at 4:8-12; *see also* 3:60-63. The inventor of the '838 Patent, Dr. Marvin Ling, had to address how this object would be implemented from a technical standpoint in an environment in which vendor computers, service provider computers and user devices would ordinarily interact over computer networks. *See* Rizzo '838 Declaration at Para. 11.

22. The solution Dr. Ling adopted was to provide "a system for conducting business transactions in a networked environment using 'electronic tokens' (or 'tokens') as a price for each item or product being offered for sale or rental by a vendor." *See* Rizzo '838 Declaration at Para. 12; see *also* '838 Patent at 5:46-50. "Since electronic tokens are used for the business transaction, the need to transmit the user's credit card number and other personal sensitive

information between the user's computer and the vendor's computer for each transaction is eliminated. Thus, the method and system of the present invention provides users the convenience of minimizing interactions between the user's computer (the client computer) and the vendor's computer (the server) thus reducing overhead. Furthermore, security for the user's personal sensitive information is improved." *See* Rizzo '838 Declaration at Para. 12; *see also* '838 Patent at 5:58.

23.     The "benefit of using the vendor-issued electronic tokens of the present invention is that privacy risks are decreased. Since all purchases or business transactions are done using tokens, very little or no personal sensitive information, such as the user's credit card number, need be transmitted over communication lines, such as the Internet. Although information transmitted via the Internet may be encrypted, it is still desirable to eliminate or minimize such transmissions, since they may be intercepted and decrypted. Furthermore, since the vendor and user interact directly for the purchase and use of electronic tokens, rather than relying on a third party such as a bank, users may be selective about which vendors they are willing to trust with their private information." *See* Rizzo '838 Declaration at Para. 13; *see also* '838 Patent at 6:29-42.

24.     "Because the user need not use a credit card for his purchases, it is unnecessary for the user to have a credit card, or for the user's computer or the vendor's computer to interact over the network with a bank or other financial institution to process credit card transactions. Additionally, since orders can be handled without credit card transactions, the overhead associated with such transactions can be reduced or eliminated, permitting micropayments." *See* Rizzo '838 Declaration at Para. 14; *see also* '838 Patent at 6:17-24.

25.     Although the claimed "server" is applied in an ecommerce system, it addresses technical computer integration issues which exist solely in the context of computer networks with a technical solution that is tied to the "server" and implemented in a way that improves the

functionality of the computer system by reducing the number and complexity of integrations required between vendors, users, and service providers. *See* Rizzo '838 Declaration at Para. 15. The invention serves to reduce the complexity of integrations in two ways. Firstly, it reduces the vendor's touch points to outside financial systems by reducing the number of times that a credit card or other financial vehicle needs to be used by the end user to make a purchase. *See* Rizzo '838 Declaration at Para. 15. This also reduces the risk of users credit cards or other financial vehicles being exposed to malicious forces. *See* Rizzo '838 Declaration at Para. 15. Secondly, due to the challenges of reconciliation for financial micro transactions, vendors would need to build out systems for caching user purchases in order to hit credit card or financial system purchase amount thresholds. *See* Rizzo '838 Declaration at Para. 15. The invention removes the need for these caching systems and thus lowers the overhead in development, support, and maintenance costs. *See* Rizzo '838 Declaration at Para. 15. It further reduces lost revenues due to any particular user never reaching the financial threshold. *See* Rizzo '838 Declaration at Para. 15.

26. The use of the claimed "server" does not simply reflect the use of generic computer technology in a conventional or routine manner. *See* Rizzo '838 Declaration at Para. 16. Indeed, the prosecution history of the '838 Patent suggests otherwise. As noted by the P.T.O Examiner at the close of prosecution, "[t]he prior art taken alone or in combination failed to teach or suggest a vendor registering user to purchase electronic tokens wherein each token having a value of at least a fraction of a dollar and authorizing a purchase at a participating vendor web site without requiring any third party authentication and a physical manifestation of the user account." *See* Rizzo '838 Declaration at Para. 16; Notice of Allowability, dated April 1, 2006, at pg. 2., a true and correct copy of which is attached as Exhibit C.

27. There are other ways of implementing a server for facilitating transactions between vendors and users without operating a server in the manner called for by the claims of

the '838 Patent. *See* Rizzo '838 Declaration at Para. 17. For example, a vendor computer need not rely on electronic tokens to facilitate "microtransactions", but instead could require credit card payments for each transaction without the use of "electronic tokens" issued by or on behalf of the vendor. *See* Rizzo '838 Declaration at Para. 17. So, the claimed invention of the '838 Patent does not cover all ways of facilitating transactions among vendors and users. *See* Rizzo '838 Declaration at Para. 17.

28. The prior art cited during the prosecution of the '838 Patent (including all references cited on the face of the '838 Patent) does not disclose information that would lead one skilled in the art to conclude that the operation of the claimed "server" including its constituent elements reflected a conventional approach to addressing the integration issues identified above. *See* Rizzo '838 Declaration at Para. 18.

29. Through the operation and active marketing of its computer-based Soccer Manager platform, Soccer Manager induces others, including at least its customers who play online games, such as its Soccer Manager games, to use the Soccer Manager "server", which meets every limitation of independent claim 27 of the '838 Patent. Soccer Manager has been placed on notice of infringement at least by way of its receipt of GTX's letter of February 9, 2018, and accompanying draft Complaint.

30. Upon information and belief, the computer-based Soccer Manager platform facilitates at least the use of a "server" operated by a vendor (i.e., Soccer Manager) that provides virtual products for sale or rent over the Internet for Soccer Manager's customers who use Soccer Manager's games, such as its Soccer Manager games.

31. Upon information and belief, the server utilized by at least one Soccer Manager customer includes a "network interface" through which the server communicates with the customer over the Internet. By way of example, the Soccer Manager "server" incorporates a network interface device that enables the server to communicate with a user via the Internet.

32. Upon information and belief, the Soccer Manager "server" utilized by at least one of Soccer Manager' customers includes a "database" that stores information related to Soccer Manager's customers.

33. Upon information and belief, the Soccer Manager "server" utilized by at least one of Soccer Manager's customers includes "memory". By way of example, upon information and belief, the Soccer Manager "server" used by Soccer Manager's customers includes a computer having at least one processor that executes software stored in a memory, the software including one or more programmed routines.

34. Upon information and belief, the software includes a "registration routine" that opens a user account with a vendor in the database for the user. By way of example, upon information and belief, the software relied upon by Soccer Manager includes a routine that registers an account associated with a customer:



35. The software also includes an "electronic token sale routine" that issues one or more electronic tokens (e.g., Credits) from Soccer Manager to the user account, wherein no physical manifestation, other than a database entry, of the user account occurs, each electronic token (e.g., Credits) having a value of at least a fraction of a dollar without any physical

manifestation other than a database entry of the user account made in connection with the purchase of virtual currency (e.g., Credits). Upon information and belief, Credits can be purchased via Soccer Manager's "server", as reflected below:



36. Upon information and belief, the software includes a "display routine" that displays the prices of the products in units of electronic tokens. By way of example, the software relied upon by Soccer Manager includes a routine that allows the display of products and prices in units of electronic tokens (e.g., Credits), as reflected below:



37. Upon information and belief, the software includes a "selection routine" that permits a user to select, at any participating vendor web site, a subset of the products for purchase from the vendor without requiring the user to disclose personal information to the vendor, a total price of the subset of the products being computed in units of electronic tokens (e.g., Credits). In particular, the software relied upon by Soccer Manager includes a routine that allows the selection of a subset of products (without requiring disclosure of personal information) at prices specified in units of electronic tokens (e.g., Credits), as reflected above in the Figure shown in Paragraph 37.

38. Upon information and belief the software authorizes a purchase transaction at the participating vendor web site (e.g., Soccer Manager's website) without requiring any third party authentication and physical manifestation of the user account via a "purchase routine" that determines if the user account contains electronic tokens (e.g., Credits) having a value equal to or greater than the total price, and if so, subtracts the total price from the user account. Upon information and belief, the purchase transaction (made through the Soccer Manager's website, for example) is not subject to a minimum processing fee.

39. Upon information and belief, the software includes a "download routine" that enables the user to download the selected subset of the products from the Internet. By way of example, upon information and belief, the software relied upon by Soccer Manager includes a routine that allows a user to download a selected subset of products (e.g., soccer-related features) for an online game, such as the Soccer Manager games, from the internet.

40. Upon information and belief, at least one of Soccer Manager's customers is liable for direct infringement of one or more claims of the '838 Patent under 35 U.S.C. §271(a) based on the use of Soccer Manager's server to the extent that the consumer has exercised control over the server and receives a benefit via the server by purchasing virtual currency and digital products (using the virtual currency) from devices in the United States.

41.     Upon information and belief, Soccer Manager has known of the '838 Patent and its infringement since at least February 13, 2018, following its receipt of GTX notice letter dated, February 9, 2018.  The letter identified the '838 Patent, alleged that Soccer Manager indirectly infringed the '838 Patent by facilitating the acquisition and utilization of electronic tokens by consumers in the United States through its "server", and included a draft Complaint explaining Soccer Manager's infringement on an element-by-element basis, of claim 27 of the '838 Patent.

**Induced Infringement By Soccer Manager**

42.     Upon information and belief, Soccer Manager had knowledge of the '838 Patent at least since its receipt of GTX's February 9, 2018 letter.

43.     Upon information and belief, Soccer Manager actively and knowingly induced another to infringe one or more claims of the '838 Patent and possessed specific intent to encourage such infringement.

44.     Despite being notified of infringement of the '838 Patent via GTX's February 9, 2018 letter, upon information and belief Soccer Manager continued to operate and market its platform to customer's including online gamers.

45.     Soccer Manager knew or should have known that its actions would induce actual infringement of the '838 Patent.

46.     In particular, Soccer Manager knew or should have known that its actions would induce customers (e.g., online gamers) to use Soccer Manager's servers to facilitate the acquisition and use of virtual currency to buy digital products, and, thus benefit from each and every element of the claimed "server" of the '838 Patent.

47.     Soccer Manager provides documentation encouraging the ongoing use of Soccer Manager' "server" and the sale of virtual currency and digital products (using virtual currency), as reflected, for example, in the documentation presented below:

> - The Web Site is free to use and play, however you may purchase additional services and features in order to enhance your use of the Web Site including without limitation private leagues ("Paid for Features").
> - Paid for Features are features of the Web Site that may used subject to these terms and conditions and on the basis of the licence granted by these terms and conditions. These terms and conditions and your use of the Web Site do not give you any rights of ownership in any property whether tangible or intangible (including in any Paid for Feature).
> - Paid for Features include a virtual currency used in and as part of the Web Site ("Virtual Currency").
> - Virtual Currency may be exchanged for other Paid for Features in and as part of the Web Site only.

http://www.soccermanager.com/terms-main.php

48. This documentation along with Soccer Manager's assistance in supporting transactions via its "server" provides evidence of an affirmative intent that, for example, the "server" be used to infringe.

49. Soccer Manager also knew or should have known that its actions would induce customers to make, use, sell, offer to sell and/or import servers that directly infringe the '838 Patent.

50. Soccer Manager is liable for induced infringement of one or more claims (e.g., claim 27) of the '838 Patent under 35 U.S.C. §271(b).

## **Willful Infringement**

51. Upon information and belief, Soccer Manager had actual knowledge of the '838 Patent at least as of its receipt of GTX's notice letter of January 9, 2018 and accompanying claim chart.

52. Upon information and belief, upon gaining knowledge of the '838 Patent, it was, or became, apparent to Soccer Manager that the operation and active marketing of its service via its computer-based platform resulted in infringements of the '838 Patent. Notwithstanding its knowledge (or willful blindness thereto), Soccer Manager continues to operate and market its service via its computer-based platform.

53. Soccer Manager has willfully infringed, and continues to willfully infringe the '838 Patent.

54. As a direct and proximate cause of the indirect infringement by Soccer Manager, GTX is being and will continue to be substantially and irreparably harmed in its business and property rights unless Soccer Manager is enjoined from operating its computer-based Soccer Manager platform in the United States.

55. In addition, GTX is suffering injury for which it is entitled to monetary relief as a result of Soccer Manager's direct infringement.

## PRAYER FOR RELIEF

WHEREFORE, GTX respectfully requests that this Court enter a Judgment and Order:

(a) Declaring that the Patent-In-Suit is valid and enforceable;

(b) Declaring that Soccer Manager has indirectly infringed and continues to indirectly infringe, either literally or under the doctrine of equivalents, at least one valid and enforceable claim of the Patent-In-Suit under 35 U.S.C. §271(b);

(c) Declaring that Soccer Manager's infringement is willful and that GTX is entitled to treble damages under 35 U.S.C. § 284 for past infringement;

(d) Awarding GTX damages adequate to compensate for Soccer Manager's infringement, but in no event less than a reasonable royalty for past infringement;

(e) Either (1) permanently enjoining Soccer Manager, its officers, agents, servants, and employees and those unlicensed persons in active concert or participation with any of them, including app stores, from operating and marketing its service via its computer-based platform to facilitate the acquisition and use of "in-app" virtual currency to buy digital products, including engaging in communications with any of such app stores or consumers to facilitate the "in-app" acquisition and use of virtual currency to buy digital products, or (2) awarding damages in lieu of an injunction, in an amount consistent with the fact that for future infringement

    Soccer Manager will be an adjudicated infringer of a valid patent, and trebles that amount in view of the fact that the future infringement will be willful as a matter of law;

(f) Declaring that this is an exceptional case under 35 U.S.C. §285 and awarding GTX its attorney's fees, costs, and expenses, based in part on, but not limited to, Soccer Manager's willful infringement; and

(g) Granting GTX such other and further relief as this Court deems just, proper, and equitable.

Dated: February 26, 2017       **THE deBRUIN FIRM, LLC**

                  */s/ David W. deBruin*
                  David W. deBruin (#4846)
                  1201 N. Orange Street, Suite 500
                  Wilmington, Delaware 19801
                  Telephone: (302) 660-2744
                  Facsimile: (302) 650-1574
                  ddebruin@thedebruinfirm.com
                  *Attorneys for Plaintiff GTX Corp.*

*Of Counsel:*
**RUBIN AND RUDMAN LLP**
Leslie L. Jacobs, Jr. (*pro hac vice forthcoming*)
800 Connecticut Avenue, NW
Washington, DC 20006
Telephone: (240) 356-1549
Facsimile: (202) 223-1849
ljacobs@rubinrudman.com
gcoman@rubinrudman.com
*Attorneys for Plaintiff GTX Corp.*